## JANIN *v.* CURTISS.

PATENTS; INTERFERENCE; REDUCTION TO PRACTICE.

1. Where both parties to an interference reduce to practice on the same day, the party first to conceive is entitled to priority. (Following *McParland* v. *Beall, ante,* 162.)

2. Where the count of an issue in an interference embraces several elements, concerning only one of which there is a contest between the parties, nevertheless the whole issue must be considered in determining the question of reduction to practice.

3. Where an invention is designed to perform a definite purpose, a construction embodying it must be capable, when operated, of performing that purpose. If tests are necessary to demonstrate such capability, then tests must be made, and the tests so made must result in the expected performance. (Following *Sydeman* v. *Thoma,* 32 App. D. C. 362.)

4. In an interference relating to hydroaeroplanes, in which the contest was as to whether one of the parties reduced to practice by a test of his device made on a certain day, and he claimed that the count of the issue called for a machine capable of skimming over the surface of the water at a great speed without capacity to rise from the water and fly, and also that the only reason his machine did not rise from the water in such test was that its engine was not sufficiently powerful, it was *held,* on a consideration of the language of the count and of such party's introduction to his specification, in which he claimed that his invention related to improvements in heavier than air flying machines, and had reference particularly to a machine adapted to alight on the water and rise therefrom by its own power, although some of its features were applicable to ordinary heavier than air machines, and to his drawings, which disclosed a flying machine, and also to magazine publications in which he told of experiments made

after such test, which culminated, he claimed, in success at a subsequent test,—that the issue called for a machine capable of rising from and alighting upon the water, and that what such party claimed to be a reduction to practice, amounted to no more than a crude experiment with an inoperative device.    (Mr. Justice Robb dissenting.)

No. 1027.    Patent Appeals.    Submitted March 16, 1916.    Reargued May 8, 1916.    Decided June 1, 1916.

HEARING on an appeal from decision of the Commission of Patents in an interference proceeding.                   *Reversed.*

The facts are stated in the opinion.

*Mr. Thomas A. Hill* for the appellant.

*Mr. William H. Kenyon* for the appellee.

Mr. Justice VAN ORSDEL delivered the opinion of the Court:

This is an appeal from the decision of the Commissioner of Patents in an interference proceeding awarding priority of invention to appellee, Glenn H. Curtiss, in an invention relating to hydroaeroplanes expressed in a single count, as follows:

"A hydroaeroplane comprising a main aeroplane supporting surface, lateral stabilizing aeroplane surfaces to create a difference of lift, a main water-borne central boat structure adapted to support the entire machine when on the water, and except for the aeroplane lift, constituting substantially the entire supporting element at all speeds so long as the boat structure is traveling in contact with the water, relatively small horizontal water balancing floats located below the supporting plane and beyond each side of said boat structure, said floats being located above the level of the boat bottom and provided with surfaces inclined downwardly and rearwardly, adapted to be acted upon by the rush of water when the machine loses its lateral equilibrium, and means for operating the stabilizing surfaces to create a difference of air lift."

The interference was declared originally between the application of appellant, Albert S. Janin, filed July 31, 1913, and the application of Curtiss filed August 22, 1911. The Janin application is a substitute for an earlier application filed January 26, 1911, and which is held by all the tribunals below to constitute a constructive reduction to practice of the invention in issue, therefore making Curtiss the junior party. To the satisfaction of all the tribunals of the Patent Office, except the Commissioner, Janin has established a date of conception of the invention as early as 1907, while all have agreed that the earliest date that can be accorded Curtiss is May, 1910.

Curtiss claims, and has been awarded, actual reduction to practice in May, 1910, by the Examiner of Interferences and the Commissioner, while the Board of Examiners in Chief awarded him actual reduction to practice on January 26, 1911, the same date on which Janin filed his application in the Patent Office. We are in accord that Janin conceived the invention in 1907, and constructively reduced it to practice January 26, 1911. The case, therefore, turns upon the claim of Curtiss's reduction to practice in May, 1910; for if, as held by the Board of Examiners in Chief, he did not reduce to practice until January 26, 1911, both parties reducing to practice on the same date, and Janin being the first to conceive, he must prevail. *McParland* v. *Beall, ante,* 162 (January, 1916, term).

The case, therefore, turns upon the Curtiss alleged reduction to practice of May, 1910. It appears that in May, 1910, Curtiss experimented with a machine at Hammondsport, New York, of which photographs appear in the record and which is claimed to have embodied the subject-matter of the count in issue. As to this test, it is conceded by Curtiss that he only succeeded in driving the machine over the water at a rapid rate of speed, but did not succeed in making the machine rise from the water into the air.

It appears that after the experiment at Hammondsport, Curtiss dismantled his machine and constructed another, different in many particulars, which he shipped to San Diego, California, where, on January 26, 1911, the day Janin filed his application,

he, for the first time, succeeded in rising from the land and alighting upon the water, and rising from the water and alighting upon the land. If this was his earliest reduction to practice, as we have observed it was too late to avail him anything, in the light of Janin's earlier conception.

It is important here to consider what is claimed by this count, in order to determine the sufficiency of the Hammondsport test. The count consists of five separate elements, as follows:

1. "A hydroaeroplane comprising a main aeroplane supporting surface."

2. "Lateral stabilizing aeroplane surfaces to create a difference of lift."

3. "A main water-borne central boat structure adapted to support the entire machine when on the water, and, except for the aeroplane lift, constituting substantially the entire supporting element at all speeds so long as the boat structure is traveling in contact with the water."

4. "Relatively small horizontal water balancing floats located below the supporting plane and beyond each side of said boat structure, said floats being located above the level of the boat bottom and provided with surfaces inclined downwardly and rearwardly, adapted to be acted upon by the rush of water when the machine loses its lateral equilibrium."

5. "And means for operating the stabilizing surfaces to create a difference of air lift."

While the contest here centers around the fourth element above stated, the whole issue must be considered in determining the question of reduction to practice. It is contended by counsel for Curtiss in the reargument, which was confined to the single question of whether or not the Hammondsport experiment by Curtiss amounted to a reduction to practice, that what the claim calls for is a machine capable of skimming the surface of the water at great speed, without capacity to rise from the water and fly. We are not impressed with this contention, nor do we think Curtiss's own theory of the case substantiates it. Indeed, the third element of the claim above quoted clearly implies a machine capable of rising from the water, in that it

describes the function of the boat as only of value when the machine is in contact with the water.

To determine whether this test was a reduction to practice of the invention for which Curtiss is now seeking a patent, it is important to consider his application. In the introduction to his specification he describes the invention as follows: "My invention relates to improvements in heavier than air flying machines, and has reference particularly to a machine adapted to alight on the water and rise therefrom by its own power. Some of the features of invention are, however, applicable to ordinary heavier than air machines." This statement of the scope of his invention embodies in brief what he describes in his specification. His drawings disclose a flying machine, and of his fifty-one claims all but claim 38 call for a flying machine, and that claim calls for an aeroplane.

Curtiss has used the term "hydroaeroplane" as interchangeable with "hydro-machine," "flying boat," "aeroboat," and similar terms, all referring to heavier than air flying craft capable of rising from the water, flying in the air, and alighting upon the water. That Curtis was aiming at this achievement in the Hammondsport experiment is clear, we think, from the circumstances and from his own statements. It may be suggested that what Curtiss said and did in May, 1910, in relation to this test, is of much more importance, as indicating what he had in mind, than his testimony in this interference as to what he was then attempting to accomplish.

Appearing in the record are extracts from publications admitted by Curtiss to be correct, extending from the Hammondsport experiment down through the San Diego tests, in which he always refers to his machine as a hydroaeroplane. He was a pioneer in this art, and well knew the signification of the term and that it did not refer to a mere water-skimming device. That what he was aiming at was a flying machine capable of rising from and alighting upon the water is evidenced by his article in "Country Life in America," where he says of his experiments which culminated in the improved machine at San Diego: "On January 26 (1911) success finally came."

The excuse Curtiss makes for not rising from the water in the May, 1910, experiment is that the engine was not sufficiently powerful. He is now claiming a reduction to practice of an invention capable of rising from the water. That Curtiss then thought that his engine was sufficient is supported by the fact that on the same lake in the spring of 1910, he had succeeded in rising from the ice with a twelve horse-power engine. It is not inconsistent that he may have thought that with a perfect boat structure, which he undoubtedly believed he had, he could skim the water before rising, with as little resistance as on ice. It may be here suggested that if Curtiss was not attempting to fly, why did he not say so at the time, instead of now insisting that he was only attempting to solve the problem of successfully skimming on the water, while, in the same breath, declaring that he was not disappointed when his machine failed to rise from the water, and attributing his failure to rise to the inadequacy of the engine?

The Hammondsport machine, as shown in the photograph, has little likeness in many respects to the modern flying boat described in the Curtiss application. Curtiss, testifying as to the San Diego machine, refers to it as "on the line of development between the original pontoon and the later more boat-like structure." The San Diego boat was closed at the top, "with the exception of openings which were made for inspection purposes." That was a very different sort of structure of boat from that disclosed in the Hammondsport photograph. The operator's seat in the San Diego structure was 30 inches, and the bottom of the motor 48 inches, above the top of the boat. The supply tanks were still elevated above the motor. Not much like the flying boat of the Curtiss application, with the operator seated down in the boat and the engine down almost on a level with him. Yet the San Diego machine was a modification in this particular of the Hammondsport device, which, from the photograph, in the light of modern development, would seem to be about as fit for flying as a bird with its body above its wings. While Curtiss was trying to fly in this test, it seems absurd to call the thing used a reduction to practice of the invention in

issue, in the light of his present application. It amounted to nothing more than a crude experiment with an inoperative device.

The issue calls for and describes a hydroaeroplane,—a machine capable of rising from and alighting upon the water. That this is what Curtiss was seeking to accomplish is clearly shown by the record. It as clearly appears that the experiment failed as a reduction to practice of the invention now claimed, and to which the count of the issue applies.

This is not a combination claim, calling for elements in combination with a hydroaeroplane, but for a hydroaeroplane containing certain elements. The present contention of Curtiss is an afterthought. What the record clearly discloses he was doing was to perfect a heavier than air machine capable of rising from and alighting upon the water. We are here dealing with a new art in which the parties were pioneers. No rule of obvious mechanical skill can be invoked. It marked a new step to be taken in an undeveloped art, and nothing short of its achievement can arise to the dignity of actual reduction to practice. The rule is well stated in the opinion of the Board of Examiners in Chief, as follows: "The law is well settled that where an invention is designed to perform a definite purpose, a construction embodying it must be capable, when operated, of performing that purpose. If tests are necessary to demonstrate such capability, then tests must be made, and the tests so made must result in the expected performance. *Sydeman* v. *Thoma,* 32 App. D. C. 362."

The Board of Examiners in Chief, answering the holding of the Examiner of Interferences that what Curtiss did was equivalent to a reduction to practice, said: "The Examiner of Interferences has accepted this view of the case, and taken the position that what Curtiss did should be regarded as the equivalent of a reduction to practice, because all that was wanting was a motor sufficiently powerful to enable him to lift the machine from the water. An excuse of this kind for failure to make flights could probably be advanced in good faith by hundreds of inventors of aeroplanes, who have been seeking

patents for the last forty or fifty years. Many, if not most, of their constructions could probably have been flown had they been equipped with a sufficiently powerful motor. The truth of this fact is shown, if newspaper reports may be credited, by a demonstration recently made by Curtiss himself with the old Langley machine equipped with a suitable motor. * * * The fact that he was the first to actually reduce to practice and to give to the world a new art, in the words of the Examiner of Interferences, affords no warrant for overriding the law as to the sufficiency of an unchallenged constructive reduction to practice to show the completion of the invention. * * * Curtiss is not the first inventor who has almost reduced the invention to practice, and who may have afterwards further developed it, but has failed to get a patent because of what another has achieved. The failure to award Curtiss the subject-matter of this specific count will not take from him all of the patentable subject-matter which he may have originated, and which belongs to this art. We can perceive no justification for making an exception to the general rule of law which applies to these cases, in favor of an inventor who happens to have been the first to give an invention to the world by an actual reduction to practice, however great his achievements, or however wide his fame, when another equally ingenious in originating a novel idea, though quite unknown, has anticipated him by taking an equivalent course in the same direction, a course which under the rules of law, as uniformly applied, entitles him to a patent."

The decision of the Commissioner of Patents is reversed, and the clerk is directed to certify these proceedings as by law required.                                        *Reversed.*

Mr. Justice Robb dissented.

A petition for a rehearing was denied October 9, 1916.